UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VARIBLEND DUAL DISPENSING SYSTEMS LLC,

Plaintiff,

-against-

CRYSTAL INTERNATIONAL (GROUP) INC. and
GERHARD BRUGGER,

Defendants.

---

GERHARD BRUGGER,

Counterclaim-Plaintiff,

-against-

VARIBLEND DUAL DISPENSING SYSTEMS LLC,
J. BURKE CAPITAL PARTNERS LLC, and JBCP-
24 LCC,

Counterclaim-Defendants.

---

**OPINION AND ORDER**

18 Civ. 10758 (ER)

---

Ramos, D.J.:

VariBlend Dual Dispensing Systems ("VariBlend") brings three causes of action against

defendants Crystal International Group, Inc. ("Crystal") and Gerhard Brugger ("Brugger"):

breach of contract against Brugger, tortious interference with contract against Crystal, and unfair

competition against Crystal. In response, Brugger alleges several counterclaims against

VariBlend, J. Burke Capital Partners LLC ("J. Burke"), and JBCP-24 LLC (collectively

"Counterclaim-Defendants"), including breach of contract, fraud, and unfair competition against

all Counterclaim-Defendants; tortious interference with contract against J. Burke and JBCP-24

(the "JBCP parties"); and declaratory judgment.

There are two sets of motions before the Court. First, VariBlend brings a motion to remand this case to New York Supreme Court and to dismiss Brugger's declaratory judgment action for lack of subject matter jurisdiction. Second, Counterclaim-Defendants bring a motion to partially dismiss Brugger's counterclaims for breach of contract, fraud, tortious interference, and declaratory judgment.

The Court DENIES VariBlend's motion to remand the case and GRANTS the motion to dismiss Brugger's declaratory judgment action for lack of subject matter jurisdiction. The Court also GRANTS Counterclaim-Defendants' motion to dismiss Brugger's counterclaims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) as to the JBCP parties, but it DENIES the motion as to VariBlend.

## I.     BACKGROUND

### A.  Factual Background

Brugger invents liquid pump dispensers and related products and technology used in the cosmetics industry. Counterclaim ¶ 9. His father, Anton Brugger, also invents the same products and technology and has assigned Brugger patent rights for his variable-flow disc technology, which allows liquids to be pumped out of multiple dispenser compartments in varying proportions and flows. *Id.* ¶ 10. Additionally, Brugger has developed liquid pump systems to be used with the variable-flow disc technology and holds patents to these pump systems. *Id.* ¶ 11.

VariBlend is a manufacturer of dual dispensing pumps. Compl. ¶ 1. In April 2010, Brugger entered into an agreement with VariBlend and another company, JBCP-24, for the purpose of commercializing his variable-flow disc technology (the "License Agreement"). Counterclaim ¶¶ 12–13. J. Burke was not a signatory to the agreement. *Id.* ¶ 13. At the time of

signing, VariBlend shared office space and a top executive, Eric Lauerwald, with both JBCP parties, and Brugger alleges that VariBlend was at all times controlled by the JBCP parties. *Id.* ¶¶ 13–17.

The License Agreement granted VariBlend exclusive rights to Brugger's variable-flow disc technology, including a "'Dispenser (together with any Improvements),' as those terms were defined therein." *Id.* ¶¶ 18–23. As per the License Agreement, a Dispenser is "any dispenser or device which is constructed or manufactured incorporating claims of . . . patent number 6,464,107B1 [the "'107 Patent"] . . . and any and all patents or other intellectual property which is based upon or used with, such patent[]." Compl. ¶ 9. The term Improvements is defined as "any improvement of the Dispenser based upon or used with, the Patent[] and[/]or any Products, including but not limited to design construction or packaging." *Id.* ¶ 10. The term Products is defined as "all products in all categories and for all uses having the Dispenser as a component." *Id.* ¶ 11. In addition to giving VariBlend the exclusive rights to all Dispensers and Improvements, the License Agreement also gave VariBlend exclusive bargaining rights for thirty days should Brugger or his affiliate "develop[] any other dispenser having an adjustable mixing ratio." *Id.* ¶ 12.

In return, VariBlend agreed to minimum sales obligations and minimum royalty payments based on those sales. *Id.* ¶¶ 13–14; Counterclaim ¶¶ 24–28. Section 5.1 of the License Agreement sets out a schedule for royalty payments. Counterclaim ¶ 25. Section 5.3 provides that "the royalty obligation of Licensee is an absolute payment obligation whether same are earned or not and failure to make payment thereof is a material default." *Id.* ¶ 26. In order to ensure royalty payments, VariBlend was to "use its commercially reasonable efforts to commercialize the Dispenser," and "to use, apply, and direct its best efforts to promote the sale

or other disposition of the Dispenser and the Products," as per §§ 2.4 and 7.1, respectively. *Id.* ¶¶ 27–28.

Needless to say, the agreement broke down and both parties assert multiple grievances. VariBlend alleges that Brugger attempted to circumvent the License Agreement in duplicitous ways. For example, it alleges that Brugger and his cousin, Holzmann, developed certain dual dispensing pump technologies and then patented these technologies in Holzmann's name (the "Holzmann Patents"), purposefully omitting Brugger as an inventor. Compl. ¶¶ 16–17. VariBlend asserts that these patents are covered by the License Agreement, either as Dispensers, Improvements, or "adjustable mixing ratio" dispensers. *Id.* ¶ 18.

VariBlend further contends that Crystal, a competing dual pump manufacturer, supported Brugger's endeavors, "with the ultimate goal of having Crystal produce products containing the Licensed Technology, from which Brugger and Crystal would benefit." *Id.* ¶ 22. According to VariBlend, Crystal was successful in incorporating the technology into the Crystal Dispensers, which it sold throughout 2018. *Id.* ¶ 24. VariBlend contends that it also has exclusive rights to these Dispensers under the License Agreement. *Id.* ¶ 25.

Brugger denies these allegations and alleges in turn that VariBlend breached the License Agreement several times. Counterclaim ¶ 29. First, he alleges that VariBlend did not properly commercialize the Dispenser. For example, it failed to produce any Dispensers from 2010 to 2011. *Id.* ¶ 30. It also failed to address quality control problems with the Dispensers or to integrate new technologies. *Id.* ¶¶ 31–34. Second, it failed to meet its minimum sales and royalty obligations beginning in 2011, almost from the outset of the Agreement. *Id.* ¶ 35. Brugger further alleges that from 2014 to 2017, in order to hide the fact that it was not making its minimum sales, VariBlend and the JBCP parties engaged in a scheme to falsify commercial

transactions.  *Id.* ¶¶ 36–42.  The scheme involved generating false invoices for the Dispensers and falsifying transactions to make it appear as if third parties that were not known to be in the business of selling or making products that required Dispensers had bought Dispensers at grossly inflated prices.  *Id.*  One of these third parties had a business address that was also Eric Lauerwald's residential address.  *Id.* ¶ 41.

Brugger also alleges that VariBlend tried to change the terms of the License Agreement at least three times, pressuring him to waive the minimum sales requirement.  *Id.* ¶¶ 43.  In March 2014, a third-party investor in VariBlend, Andreas Guldin of Emil Capital Partners, asked Brugger to waive this requirement, but Brugger declined.  *Id.* ¶ 44.  VariBlend's CEO (Robert Brands, Eric Lauerwald's predecessor) again tried to renegotiate these terms in 2015.  *Id.* ¶ 45.  In February 2018, VariBlend's CEO (now Eric Lauerwald) tried once more to renegotiate the terms.  *Id.* ¶ 46.

After Lauerwald was unsuccessful, VariBlend, allegedly at the urging of the JBCP parties, breached the License Agreement.  *Id.*  On March 9, 2018, the CEO of J. Burke, Jim Burke, e-mailed Brugger to inform him that he would no longer fund the venture with VariBlend unless Brugger waived certain obligations.  *Id.* ¶ 47.  In his e-mail, Jim Burke wrote:

> I trust you are now fully aware that VariBlend has reached a dire financial state and is out of capital.  I have been in contact with Jamie [Burke, son of CEO Jim Burke] regarding your meeting in Munich, your feedback and your most recent proposal, which we received on March 5th.  Put simply, I will not fund the business under that proposal.

*Id.* (alterations in original).  VariBlend then informed Brugger on March 15, 2018 that it lacked the funds to make the royalty payments.  *Id.* ¶¶ 48–49.

VariBlend and Brugger ended their relationship in March 2018, but their grievances did not end there.  *Id.* ¶ 50; Compl. ¶ 28.  According to its Complaint, VariBlend's fears that Brugger

had conspired with Crystal were confirmed less than a week later, when Crystal sent VariBlend's customers a letter (the "Customer Letter"), stating that it was now working with Brugger and offering to replace VariBlend's product with "other patented technologies." Compl. ¶ 31. After procuring a sample of Crystal's product, VariBlend concluded that these "other patented technologies" were based on the Holzmann Patents. *Id.* ¶ 33. VariBlend surmises that, based on the short period of time elapsed between the end of the License Agreement and the Customer Letter, Brugger and Crystal had been working together for some time, in contravention of the License Agreement. *Id.* ¶ 35. On April 19, 2018, VariBlend sent Crystal and Brugger cease and desist letters for the dual dispensers based on Brugger's or his affiliate's patents. *Id.* ¶ 37. It requested that Crystal stop "manufacturing, distributing, developing, and marketing" these dispensers and that Brugger stop "cooperating with Crystal in the manufacturing, distributing, developing, and marketing" of these dispensers. *Id.* Neither party complied. *Id.* ¶ 38. Meanwhile, Brugger alleges that VariBlend continues to breach the agreement by failing to return Brugger's materials, improperly selling information to Brugger's competitors, and failing to give Brugger access to its books and records. Counterclaim ¶¶ 51–52.

### B. Procedural History

VariBlend first filed an action against Brugger and Crystal in New York Supreme Court on May 15, 2018. In his Answer, Brugger asserted several counterclaims, adding the JBCP parties as Counterclaim-Defendants. Doc. 1, Ex. C. Brugger removed the case to this Court on November 16, 2018, alleging federal question jurisdiction pursuant to 28 U.S.C. §§ 1441, 1446, 1454, 1331, 1338, 2201, 2202, and 35 U.S.C. § 256. Doc. 1. Crystal consented to removal. Doc. 4.

VariBlend then filed the instant motion arguing that this Court (1) lacks jurisdiction over its claims because they do not "arise under" federal law and therefore also lacks supplemental jurisdiction; and (2) lacks jurisdiction over Brugger's declaratory judgment action.  Doc. 19.

While that motion was pending, VariBlend, together with its co-Counterclaim-Defendants filed a motion arguing that the Court should partially dismiss Brugger's counterclaims for breach of contract, fraud, and tortious interference under Federal Rule of Civil Procedure 12(b)(6); and Brugger's declaratory judgment action under Rule 12(b)(1).  Doc. 25. Specifically, Counterclaim-Defendants argue that the breach of contract, fraud, and tortious interference claims should be dismissed as to the JBCP parties, and that part of the breach of contract claim should be dismissed as to VariBlend.

The Court considers each of these arguments in turn.

## II.     VARIBLEND'S MOTION TO REMAND TO STATE COURT AND DISMISS BRUGGER'S DECLARATORY JUDGMENT ACTION

The Court will first consider VariBlend's motion to remand the case and to dismiss Brugger's declaratory judgment action for lack of subject matter jurisdiction.

### A.  JURISDICTION OVER THE COMPLAINT

#### 1.  LEGAL STANDARD

Removal from state court to federal court under 28 U.S.C. § 1441 is proper if the district court could have had original jurisdiction in the first instance.  Under 28 U.S.C. § 1331, district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  Specifically, 28 U.S.C. § 1338(a) gives district courts original jurisdiction over all claims "arising under any Act of Congress relating to patents."  The phrase "arising under" is given the same meaning in both statutes.  *Gunn v. Minton*, 568 U.S. 251, 257 (2013).

The Supreme Court has established that there are two avenues by which claims can "arise under" patent law for purposes of § 1338. The well-pleaded complaint must establish either that "federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808–09 (1988) (internal citations omitted). When conducting this inquiry, courts are limited to "what necessarily appears in the plaintiff's statement of his own claim . . . unaided by anything alleged in anticipation or avoidance of defenses which it is thought the defendant may interpose." *Id.* at 809 (quoting *Franchise Tax Bd. v. Constr. Laborers*, 463 U.S. 1, 10 (1983)). This is in keeping with the well-recognized principle that "the party who brings suit is master to decide what law he will rely upon, and that jurisdiction generally depends upon the case made and the relief demanded by the plaintiff." *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1578 (Fed. Cir. 1997) (internal quotations and citations omitted). However, that is not to say that "a plaintiff may . . . defeat § 1338(a) jurisdiction by omitting to plead necessary federal patent-law questions." *Christianson*, 468 U.S. at 809 n.3.

Here, VariBlend has clearly not pled a cause of action under federal patent law. Indeed, it asserts quite the opposite. *See* Doc. 20. at 1. The relevant inquiry, then, is whether Defendants are correct that "patent law is a necessary element of one of the well-pleaded claims" under the second *Christianson* prong. To satisfy this prong, the patent law issue must be "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. If this test is satisfied, "jurisdiction is proper because there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum,' which can be vindicated without

disrupting Congress's intended division of labor between state and federal courts." *Id.* (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313–14 (2005)). Importantly, the patent law question must be essential to the *entire* claim, not just to one of multiple alternative theories. "Thus, a claim supported by alternative theories in the complaint may not form the basis for § 1338(a) jurisdiction unless patent law is essential to each of those theories." *Christianson*, 486 U.S. at 810.

## 2. DISCUSSION

VariBlend maintains that jurisdiction over all its claims is improper because none of its causes of action arise under federal law. Doc. 20. In response, Defendants present two arguments for why this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). First, they argue, the Complaint "arises under" federal law because it raises questions about patent inventorship under 35 U.S.C. § 256. Doc. 1 at ¶¶ 19–25. Second, the Complaint "arises under" federal law because it raises questions of patent construction. Doc. 1 at ¶¶ 26–33.

The Court agrees with Defendant and finds that VariBlend's claim for unfair competition "arises under" federal law because it raises both questions of patent inventorship and claim construction.

### a. Patent Inventorship

Defendants assert that this Court has jurisdiction because VariBlend's claims necessarily raise a question of inventorship under 35 U.S.C. § 256. *Id.* ¶¶ 19–25. They point to VariBlend's allegations that Brugger contributed to the Holzmann Patents and that he should have been included as an inventor. VariBlend responds that all causes of action raised by the complaint can be resolved without turning to questions of inventorship. Doc. 20 at 18–23. The Court agrees with Defendants.

Patents have a presumption of validity; therefore, it is presumed that its named inventors are correct. *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997). However, 35 U.S.C. § 256 "provides a cause of action to interested parties to have the inventorship of a patent changed to reflect the true inventors of the subject matter claimed in the patent." *CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350, 1358 (Fed. Cir. 2019) (quoting *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1471 (Fed. Cir. 1997)). "Conception is the touchstone of inventorship." *Id.* (quoting *Acromed Corp. v. Sofamor Danek Grp., Inc.*, 253 F.3d 1371, 1379 (Fed. Cir. 2001)). "Accordingly, each person claiming to be a joint inventor must have contributed to the conception of the invention." *Acromed Corp.*, 253 U.S. at 1379 (citing *Fina Oil*, 123 F.3d at 1473. This is proved by "corroborating evidence of any asserted contributions to the conception of the invention." *Fina Oil*, 123 F.3d at 1474. In addition to conception, the person claiming inventorship "must show that he made 'a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and [did] more than merely explain to the real inventors well-known concepts and/or the current state of the art.'" *Acromed Corp.*, 253 F.3d at 1379 (quoting *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed Cir. 1998)).

The key question for the Court in this case is whether patent inventorship "is a necessary element of one of the well-pleaded claims." *Christianson*, 486 U.S. at 808–809. To reiterate, the issue of inventorship issue must be "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258.

The Court finds that the last three prongs of this test are easily met for all of VariBlend's claims. First, the issue is clearly disputed. *See, e.g.*, Docs. 20, 29, 32 (the parties' memoranda

on the Motion to Remand).  Second, the issue of patent inventorship is substantial.  *See, e.g.*, *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1330 (Fed. Cir. 1998), *overruled on other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999) (finding that questions of patent inventorship are "substantial enough to satisfy the jurisdiction test"); *Bd. of Regents v. Nippon Tel. & Tel. Corp.*, 414 F.3d 1358, 1363 (Fed. Cir. 2005) (same).  Finally, there is a recognized federal interest in giving federal courts jurisdiction over patent law issues.  *Univ. of Colo. Found. v. Am. Cyanamid*, 196 F.3d 1366, 1372 (Fed. Cir. 1999).

Therefore, the Court will focus on whether any of VariBlend's three causes of action "necessarily raise" the question of inventorship.  To show that a patent law claim is necessarily raised, VariBlend must "set up some right, title or interest under the patent laws, or at least make it appear that some right or privilege will be defeated by one construction, or sustained by the opposite construction of these laws."  *Christianson*, 486 U.S. at 807–08 (internal quotations and citations omitted).  Courts are clear that "a claim supported by alternative theories in the complaint may not form the basis for § 1338(a) jurisdiction unless patent law is essential to each of those theories."  *Id.* at 810.  Phrased differently, the relevant inquiry is whether patent inventorship *must* be decided under all theories of recovery for at least one of the three causes of action.  The Court finds that this is true for the unfair competition claim.

### i.      First Cause of Action:  Breach of Contract Against Brugger

Both parties focus most of their attention on the breach of contract claim.  However, this is the easiest to dispose of.

In their argument that the breach of contract claim necessarily raises a question of patent inventorship, Defendants first home in on the importance of this question to VariBlend's

allegation that the duty of good faith and fair dealing was breached, arguing that this claim is separate and apart from its broader breach of contract claim. Doc. 29 at 5–10. In the alternative, Defendants argue that the breach of contract claim, even taken as a whole, necessarily raises a question of patent inventorship. *Id.* 10–11. The Court does not agree.

### A. *Breach of good faith and fair dealing is an alternative theory for establishing breach of contract.*

As a preliminary matter, the Court considers Defendants' argument that the Complaint contains a separate cause of action for breach of the implied covenant of good faith and fair dealing. Defendants locate this cause of action in paragraph 46 of the Complaint. Paragraph 46 reads: "In breach of the License Agreement's implied duty of good faith and fair dealing, Brugger conspired with Holzmann and Crystal to have Holzmann obtain the Holzmann Patents to circumvent VariBlend's exclusive rights to the Licensed Technology."

"The covenant of good faith and fair dealing 'embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Obex Sec., LLC v. Healthzone Ltd.*, No. 10 Civ. 6876 (SAS), 2011 WL 710608, at *2 (S.D.N.Y. Feb. 28, 2011) (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002)). Claims alleging breach of the covenant of good faith and fair dealing are "generally actionable only where wrongs independent of the express terms of the contract are asserted and demands for the recovery of separate damages not intertwined [with] the damages resulting from a breach of a contract[] are advanced." *J. Kokolakis Contracting Corp. v. Evolution Piping Corp.*, 998 N.Y.S.2d 788, 791 (Sup. Ct. 2014). But "where the conduct allegedly violating the implied covenant is also the predicate for breach . . . of an express provision of the underlying contract," these causes of action are considered one and the same. *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002)

(quoting *ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243–44 (S.D.N.Y. 1997)); *see also*

*Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) ("[W]hen a complaint alleges

both a breach of contract and a breach of the implied covenant of good faith and fair dealing

based on the same facts, the latter claim should be dismissed as redundant.")). Where "parties to

an express contract are bound by an implied duty of good faith . . . breach of that duty is merely a

breach of the underlying contract." *Harris*, 310 F.3d at 80 (quotations and citations omitted).

Paragraph 46 cannot be read as a separate cause of action for breach of the implied

covenant of good faith and fair dealing. As written, it does not arise out of a separate and

distinct duty outside of the License Agreement. Instead, it is explicitly lodged in "the License

Agreement's implied duty of good faith and fair dealing." Compl. ¶ 41. It is also based on the

same factual allegations as the breach of contract claim—that Brugger violated the License

Agreement by developing related technology that it failed to make available to VariBlend. This

is the same behavior underlying paragraphs 44 and 45, which contain other theories by which

VariBlend hopes to establish breach of contract. Therefore, the Court finds that, in this case,

breach of the implied duty of good faith and fair dealing is one theory for establishing breach of

contract, not a separate and distinct cause of action.

**B. *The breach of contract claim does not necessarily raise a question of patent inventorship.***

Thus, the Complaint includes three theories for establishing breach of contract: (1)

breach of § 2.1.1 of the License Agreement, Compl. ¶ 44; (2) breach of § 2.5 of the License

Agreement, *id.* ¶ 45; and (3) breach of the implied covenant of good faith and fair dealing, *id.*

¶ 46. In order to succeed in establishing jurisdiction, Defendants must show that the question of

inventorship is necessarily raised by all three theories. *Christianson*, 486 U.S. at 810. The Court

finds that this is not the case.

13

Section 2.1.1 of the License Agreement provides in relevant part that VariBlend has "the exclusive right to license, manufacture, distribute or develop the Dispenser (together with any Improvements) . . . and manufacture or produce and sell the Products in the Territory." Under this theory of the claim, VariBlend alleges that "Brugger developed the 'other patented technologies' referenced in the Customer Letter, which constituted Licensed Technology belonging exclusively to VariBlend, and licensed those technologies to Crystal." Compl. ¶ 44. VariBlend alleges that "the 'other patented technologies' are the bases for the [Holzmann Patents] obtained by Brugger/Holzmann and constitute Licensed Technology or otherwise fall within the scope of the License Agreement." *Id.* ¶ 31. Under § 2.1.1, it is irrelevant whether Brugger is the proper inventor of the Holzmann Patents. If, as the Complaint alleges, he helped *develop* these patents—regardless of whether he would meet the technical requirements of inventorship, including conception and contribution—he would be in breach of § 2.1.1. A Court need not decide whether Brugger should be a named inventor on the Holzmann Patents to find that he helped to develop these patents. Because a question of inventorship must be necessarily raised by *all* theories of the claim in order to warrant federal jurisdiction, the Court finds that the question of inventorship is not necessarily raised by breach of § 2.1.1 of the License Agreement.[1]

Defendants cite two cases in support of their position, but the Court does not find these convincing. In *Pagidas v. Buster*, the District Court of Rhode Island considered whether a conversion claim concerning intellectual property that had subsequently been patented

---

[1] The Court likewise finds that neither the second nor the third theory necessarily raise questions of inventorship. Section 2.5 of the License Agreement, like § 2.1.1, is not contingent on whether Brugger invented the Holzmann Patents, but rather on whether he "*develop[ed]* any other dispenser having an adjustable mixing ratio." License Agreement § 2.5 (emphasis added). Breach under this provision could be established without reference to the Holzmann Patents at all. Likewise, to determine whether Brugger conspired with Holzman does not require a finding that Brugger conceived of the ideas in the patent and contributed to their invention in a significant way. *See Pannu*, 155 F.3d at 1351. For example, the Court could find that Brugger told Holzmann about his inventions and "the current state of the art," *id.*, or that he helped Holzmann fill out paperwork—both in furtherance of a conspiracy—without deciding whether he met the formal requirements of inventorship.

necessarily implicated a federal question. No. 16-390S, 2016 WL 11545018 (D.R.I. Nov. 16, 2016). The Court found that "the issue of patent-law inventorship is necessarily raised by [the] state law conversion claim" because "[w]ithout the patents, nothing has been converted." *Id.* at *5. This was because "[the] right of possession and control in [the] intellectual property is not impaired until [Defendant] procures the patents allegedly embodying [Plaintiff's] ideas, and assigns the rights in those patents without her knowledge and consent." *Id.* Here, in contrast, the breach of contract claim is not explicitly premised on Brugger being a named inventor of the Holzmann Patents. His mere contribution to these patents, or to any other dual pump dispenser technology, would be enough to establish breach. Similarly, in *Intellisoft, Ltd. v. Acer America Corporation*, the Northern District of California found that "[p]laintiff's only theory here is that it *owns* the purportedly misappropriated trade secret because Bierman *invented* it. That theory of ownership, as discussed above, requires the application of federal inventorship law." No. 17 Civ. 6272 (PJH), 2018 WL 6421872, at *7 (N.D. Cal. Dec. 6, 2018). In contrast, VariBlend's breach of contract claim contains at least one theory on which it can decide the claim without raising questions of inventorship.

Therefore, inventorship is not necessarily raised by the breach of contract claim.

### ii. Second Cause of Action: Tortious Interference Against Crystal

VariBlend raises two alternative theories for its tortious interference cause of action.[2] First, it alleges that,

Crystal intentionally and maliciously urged Brugger to breach the License Agreement, and procured breach of the License Agreement, by conspiring with Brugger and

---

[2] In the Notice of Removal, Brugger asserts, albeit minimally, that the second and third causes of action also necessarily raise questions of inventorship. Doc. 1 at ¶ 23. Though neither party focuses extensively on these causes of action, the Court does not have this luxury when resolving jurisdictional disputes. *See, e.g.*, *Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 361–62 (2d Cir. 2000) ("[It] is the obligation of a court, on its own motion, to inquire as to subject matter jurisdiction and satisfy itself that such jurisdiction exists.").

Holzmann to obtain the Holzmann Patents in order to circumvent VariBlend's exclusive rights under the License Agreement and allow Crystal to produce products in competition with VariBlend.

Compl. ¶ 55. Second, VariBlend alleges that, "Crystal intentionally and maliciously urged Brugger to breach the License Agreement, and procured breach of the License Agreement, by urging Brugger to license Crystal the Licensed Technology, by developing and manufacturing the Crystal Dispensers based upon the Licensed Technology, and by subsequently marketing the Crystal Dispensers to VariBlend's customers." *Id.* ¶ 56.

Under New York law, the elements of tortious interference are "(1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'" *See Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996)).

Resolving the question of patent inventorship is not necessary to establish any of these elements for either theory. Whether Brugger merely helped Holzmann in developing or applying for the patents or contributed significantly enough to be considered an inventor, he would still be in breach of the License Agreement.[3] The central question raised by this cause of action is whether Crystal intentionally procured this breach. It is not necessary to resolve the proper inventorship of the Holzmann Patents to answer that question.

### iii.    Third Cause of Action:  Unfair Competition Against Crystal

VariBlend's claim for unfair competition, however, contains no such escape hatch. The Court therefore finds that this cause of action necessarily raises a question of patent inventorship.

---

[3] Moreover, the allegations in paragraph 56 have nothing to do with Holzmann at all, meaning that—at the very least—a court could resolve the tortious interference claim on this theory without reaching patent inventorship.

VariBlend raises two alternative theories under this cause of action. First, it alleges that,

> Crystal, in bad faith and with knowledge of the [*sic*] VariBlend's exclusive rights to the Licensed Technology, obtained access to Improvements and conspired to exclude VariBlend from access to those same Improvements, including by deceptively conspiring with Brugger and Holzmann to obtain the Holzmann Patents in Holzmann's name for the sole purpose of circumventing VariBlend's rights under the License Agreement.

Compl. ¶ 67. Second, it alleges that "[b]y creating the Crystal Dispensers, Crystal, in bad faith and for its own benefit, misappropriated VariBlend's rights to the Licensed Technology, as well as the fruits of VariBlend's labors and expenditures." *Id.* ¶ 69.

"The essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001). A claim for unfair competition by misappropriation[4] can be broken down into two elements. VariBlend must show that defendant "(1) misappropriated the plaintiff's labors, skills, expenditures, or good will; and (2) displayed some element of bad faith in doing so." *Sidney Frank Importing Co., Inc. v. Beam Inc.*, 998 F. Supp. 2d 103, 209 (2007) (internal quotation marks and citation omitted).

In order to establish the first element, VariBlend must show that it owned or was entitled to the "misappropriated" property, in this case the Holzmann Patents and the Crystal Dispensers.

---

[4] Under New York law, an unfair competition claim may be based on either of two theories— "palming off" or misappropriation. *Sidney Frank Importing Co. v. Beam Inc.*, 998 F. Supp. 2d 193, 208–09 (S.D.N.Y. 2014) (internal citation omitted). "Palming off is the sale of goods of one manufacturer as those of another." *Id.* (citation omitted). On the other hand, "[m]isappropriation is . . . described as taking the skills, expenditures, and labor of a competitor and misappropriating for the commercial advantage of one person a benefit or property right belonging to another." *Id.* at 209 (internal quotations and citations omitted). VariBlend nowhere alleges that Crystal "palmed off" their products—in other words, took VariBlend's product and "substituted its product for [VariBlend's] when customers specifically asked for [VariBlend's]" or otherwise "misrepresent[ed]" their products' "source." *ITC Ltd. v. Punchgini, Inc.*, 880 N.E.2d 852, 858 n.2 (N.Y. 2007) (quotation marks and citations omitted). Their unfair competition claim is therefore most likely based on misappropriation.

To do this, it must establish that Brugger not just developed the Holzmann Patents, but that he had some ownership interest in them (i.e., because he was the proper inventor, *see, e.g.*, *Alfred E. Mann Found. v. Cochlear Corp.*, 604 F.3d 1354, 1360 (Fed. Cir. 2010)). This is because the License Agreement does not automatically give VariBlend ownership rights to all "dispenser[s] having an adjustable mixing ratio" developed by Brugger or his affiliate. *See* License Agreement § 2.5. It only gives VariBlend an opportunity to "negotiate, in good faith . . . for a non-exclusive license for such development." Therefore, the only way that VariBlend can show that it has rights to the Holzmann Patents or to the Crystal Dispensers is to show that these in some way belonged to Brugger. In other words, in order to prevail on its unfair competition claim, VariBlend must establish that Brugger is an inventor of the products sold by Crystal; the License Agreement between Brugger and VariBlend cannot give VariBlend rights to patents or dispensers owned by third parties.

***

The Court finds that the question of patent inventorship is necessarily raised by at least one cause of action in the Complaint, and that this question is substantial, necessarily disputed, and appropriate for resolution by federal courts. Therefore, the question of patent inventorship under 35 U.S.C. § 256 gives this Court federal question jurisdiction under 28 U.S.C. § 1338(a).

### b. Claim Construction and Infringement Analysis

In addition to patent inventorship, Defendants allege that the Complaint necessarily raises other substantial questions of patent law, including claim construction, providing the Court with an additional, independent reason for jurisdiction. Doc. 1 ¶¶ 26–33. They argue that "in order to ascertain the scope of what constitutes a Dispenser and Improvements to the Dispenser, it is necessary to compare patent claims of the patents licensed under the License Agreement, such as

[the '107 Patent], with products that VariBlend asserts were improperly licensed to Crystal." *Id.* ¶ 31.

Again, for a claim to "arise under" federal law for purposes of 28 U.S.C. § 1338(a), questions of patent law must be "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. For reasons similar to those described *supra* Section II.A.2.a, VariBlend's causes of action for breach of contract and tortious interference do not necessarily raise questions of claim construction. However, as discussed in more detail below, the Court finds that the unfair competition claim also necessarily raises a question of claim construction and provides the Court with an additional, independent reason for asserting jurisdiction.

### i. A question of claim interpretation is necessarily raised by the Complaint.

At several points, the Complaint asks the Court to consider whether the Holzmann Patents and the Crystal Dispensers are "Licensed Technology" covered by the License Agreement. The Court finds that interpreting the term "Licensed Technology" necessitates construing the '107 Patent's claims. Because this construction is implicated by all theories of the unfair competition cause of action, a question of patent law is necessarily raised.

### A. The Unfair Competition Claim Requires Interpreting "Licensed Technology"

While the interpretation of the term "Licensed Technology" is brought into question by all three causes of action, it is necessarily raised by at least the unfair competition claim. As previously established, to prove this claim, VariBlend must show that it owned or was entitled to the property in question, in this case the Holzmann Patents and/or the Crystal Dispensers before he can show that Defendants "misappropriated" it. VariBlend would only be entitled to the

Holzmann Patents and/or the Crystal Dispensers if they fell within the scope of "Licensed Technology" as defined by the License Agreement. The Complaint raises no alternative theories for the unfair competition claim that can be resolved without interpreting this term.

### B. Interpreting "Licensed Technology" Requires Patent Law

The interpretation of "Licensed Technology," defined as "Dispensers and Improvements," requires federal patent law. Compl. ¶ 10. The License Agreement defines Dispenser as "any dispenser or device which is constructed or manufactured incorporating claims of . . . [the '107 Patent] . . . and any and all patents or other intellectual property which is based upon, or used with, such patents." License Agreement § 1.2.1. According to the License Agreement, Improvements "means any improvement of the Dispenser based upon, or are [*sic*] used with, the Patents and or any Products, including but not limited to design construction and packaging." *Id.* § 1.2.4. Products "means all products in all categories and for all uses having the Dispenser as a component." *Id.* § 1.2.3. By the very terms of the License Agreement, then, in order to determine what qualifies as a Dispenser, a Court would necessarily have to look at least to the '107 Patent to see whether its claims have been incorporated. The same is true for an Improvement, which incorporates the definition of Dispenser. Moreover, the Complaint alleges that "[t]he Holzmann Patents constitute Patents as defined in the License Agreement," which also necessitates looking to the '107 Patent. Compl. ¶ 18.

VariBlend argues that claim construction is not required for determining whether the Holzmann Patents and the Crystal Dispensers are Licensed Technology. First, it argues that Improvements cover a broad category of changes beyond those referencing the Patent, including changes to "design construction and packaging." Doc. 20 at 22–23. Second, it argues that "[a] trier of fact can compare the Crystal Dispensers to VariBlend's own dispensers, and determine,

for example, that the Crystal Dispensers embody Improvements to Products such as 'design construction or packaging.'" Doc. 32 at 5. The Court does not find these arguments convincing. Even to find that the Crystal Dispensers are Improvements, the Court would need to look at the '107 Patent to determine if they are "based upon or used with" these Patents. Compl. ¶ 10. And the Complaint nowhere suggests how a court could just look at the two technologies and determine that the Holzmann Patents are based on the '107 Patent. Indeed, the Complaint only says that VariBlend "determined" that this was the case; it does not indicate how, or that this method of comparison would legally suffice for purposes of interpreting the License Agreement. Compl. ¶ 33. A legal approach to this inquiry suggests, instead, that some formal construction of at least the '107 Patent's claims would be required. Such construction requires patent law.

Therefore, the Court finds that a question of claim construction that requires patent law is necessarily raised by the Complaint.

### ii. This question is sufficiently substantial to warrant federal jurisdiction.

It is not enough that the federal question be necessarily raised by at least one cause of action. The question must also be substantial. *Gunn*, 568 U.S. at 258. "The substantiality inquiry . . . looks . . . to the importance of the issue to the federal system as a whole." *Id.* at 260. This "justif[ies] resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable*, 545 U.S. at 312. For example, in *Grable*, the necessary interpretation of a federal statute was deemed sufficiently substantial to warrant federal jurisdiction. *Id.* at 316–17. And in *Smith v. Kansas City Title & Trust Co*., the constitutionality of the bond at issue received the same treatment. 255 U.S. 180 (1921). In contrast, the court in *Gunn* found that because of a legal malpractice claim's "case within a case" structure, the patent

infringement question at issue was hypothetical and would not impact the federal system. *Gunn*, 568 U.S. at 261. Therefore, it was not sufficiently substantial to warrant federal jurisdiction.

The Federal Circuit has held "that issues of inventorship, infringement, validity and enforceability present sufficiently substantial questions of federal patent law to support jurisdiction under Section 1338(a)." *Bd. of Regents*, 414 F.3d at 1363 (citations omitted). Defendants generally argue that the Court must conduct a patent infringement analysis to establish whether the Holzmann Patents and the Crystal Dispensers are considered "Licensed Technology." Doc. 29 at 10–11. VariBlend naturally disputes this. The Court agrees with VariBlend but still finds that federal jurisdiction is proper.

A patent infringement analysis requires two steps. "First, a claim is construed without regard to the accused product. Second, the claim is compared with the accused product, to determine whether all of the limitations of the claim are present either exactly or by a substantial equivalent." *Jurgens v. McKasy*, 927 F.2d 1552, 1560 (Fed. Cir. 1991). "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." *Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1360 (Fed. Cir. 2019) (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995)). Alternatively, "[u]nder the doctrine of equivalents, a product or process that does not literally infringe a patent claim may nevertheless be held to infringe 'if it performs substantially the same function in substantially the same way to obtain the same result.'" *Id.* at 1362 (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950)). The question in an infringement analysis, then, is whether the two products are either literally or functionally the same.

This is not the question that the Court would need to answer to establish whether the Holzmann Patents or the Crystal Dispensers are considered Licensed Technology.[5] Federal Circuit cases finding that infringement constitutes a substantial question of federal law specify that the finding of infringement was a *necessary* element of the claim. *See, e.g.*, *U.S. Valves, Inc. v. Dray*, 212 F.3d 1368, 1372 (Fed. Cir. 2000) ("To show that Dray sold valves in contravention of U.S. Valves' exclusive rights to such sales, U.S. Valves must show that Dray sold valves that were covered by the licensed patents. . . . Thus patent law is a necessary element of U.S. Valves' breach of contract action."); *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 986 F.2d 476, 478 (Fed. Cir. 1993) ("Adcon's right to relief necessarily depends upon resolution of a substantial question of patent law, in that proof relating to patent infringement is a necessary element of Adcon's business disparagement claim."). Without a finding of infringement, the claims in these cases could not have been proved. Breach of the License Agreement, however is not predicated on a finding of infringement.

The definitions offered for Dispenser and Improvement by the License Agreement are much broader. For example, under the License Agreement, it would suffice that the Holzmann Patents and the Crystal Dispenser are "based upon" or "used with" the '107 patent. Compl. ¶ 10 (defining Improvements). A court will necessarily have to interpret the terms "based upon" and "used with" as they apply in this License Agreement. It will not necessarily have to determine whether the Holzmann Patents or the Crystal Dispensers infringe—in the technical sense—on the '107 Patent.

---

[5] Although VariBlend alleges that the Holzmann Patents "constitute Patents as defined in the License Agreement," which would require a patent infringement analysis, it also provides that "[t]he Holzmann Patents are themselves Improvements." Compl. ¶ 18. Because there can be no alternate resolution of the claims that does not require federal law in order to assert jurisdiction, the Court must consider the more difficult case of whether identifying the Holzmann Patents as Improvements also requires a patent infringement analysis.

However, the fact remains that the '107 Patent's claims will necessarily be construed to determine whether the Crystal Dispensers were based on the patented technology covered by the License Agreement for purposes of an unfair competition claim. [6] In *Forrester Environmental Services, Inc. v. Wheelabrator Technologies, Inc.*, the Federal Circuit considered whether questions of claim construction that did not require a finding of patent infringement could give rise to federal jurisdiction. 715 F.3d 1329 (Fed. Cir. 2013). In that case, the court considered conduct that occurred in Taiwan, which could not give rise to an infringement suit. It found that "there is no prospect of a future U.S. infringement suit arising out of Kobin's use of WES-PHix or FESI-BOND in Taiwan, and accordingly no prospect of inconsistent judgments between state and federal courts." *Id.* at 1335. Additionally, "the . . . patents have all now expired, so there is also no prospect that future conduct in the U.S. could lead to an infringement suit regarding those patents." *Id.* Following the Supreme Court's precedent in *Gunn*, the Federal Circuit therefore concluded that "the potential conflict is purely 'hypothetical,'" and therefore not substantial for purposes of finding federal jurisdiction. *Id.* (citing *Gunn*, 568 U.S. at 261).

The same cannot be said here. Although the term "based upon" necessitates a broader inquiry than patent infringement, the potential for conflict between state and federal courts remains. For example, if a state court finds that the Holzmann Patents and the Crystal Dispensers are not "based upon" the '107 Patent (and therefore are also not infringing), this would conflict with any future federal court finding that the Holzmann patents infringe the '107 Patent. While VariBlend is correct that this suit is not before the Court, it is not outside the realm of possibility, as the claim would still be within the statute of limitations. 35 U.S.C. § 286. The Court is not confident that such a suit could not be brought, especially since VariBlend in

---

[6] The Complaint relies on the "based upon" language in the definition of Improvements, rather than on the "used with" language. *See, e.g.*, Compl. ¶¶ 18, 25, 68.

part alleges that "[t]he Holzmann Patents constitute Patents as defined in the License Agreement." Compl. ¶ 18. Moreover, any construction of the patent claims at issue may also have res judicata implications for future federal actions on the same patent. Resolution of this patent question, then, has the potential to impact future federal patent litigation. *Cf. Gunn*, 568 U.S. at 261 ("Because of the backward-looking nature of a legal malpractice claim, the question is posed in a merely hypothetical sense: *If* Minton's lawyers had raised a timely experimental-use argument, would the result in the patent infringement proceeding have been different? No matter how the state courts resolve that hypothetical 'case within a case,' it will not change the real-world result of the prior federal patent litigation."). Therefore, it is substantially important to the federal system for purposes of asserting federal jurisdiction.

### iii. The question is actually disputed and can be resolved without disturbing the federal/state balance.

The question of whether VariBlend owns or is entitled to the Holzmann Patents and the Crystal Dispensers is actually disputed, as evidenced by this litigation. The question can also be resolved without disturbing the federal/state balance. There is a recognized interest in uniformity in patent law. *Univ. of Colo. Found., Inc.*, 196 F.3d at 1372 (Fed. Cir. 1999). Moreover, Congress has given federal courts exclusive jurisdiction over patent law. 28 U.S.C. § 1338(a). States, therefore, do not have an interest in interpreting questions of federal patent law.

***

For the foregoing reasons, the Court finds that the question of claim construction present in the unfair competition claim is necessarily raised, substantial, actually disputed, and capable of resolution without disturbing the federal/state balance intended by Congress. This provides the Court with an additional basis for jurisdiction under 28 U.S.C. § 1338(a).

### c. Supplemental Jurisdiction Over the Remaining State Law Claims

VariBlend argues that this Court does not have supplemental jurisdiction over its remaining state law claims because it does not have jurisdiction over any of its claims. Doc. 20 at 23–24. As the Court has established, this is not the case. Section 1367(a) of Title 28 of the United States Code gives federal courts supplemental jurisdiction over state law causes of action "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." State and federal law claims form part of the same controversy if they "derive from a common nucleus of operative fact." *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004) (citation omitted). Such is the case here. All three causes of action arise from the same behavior, by the same parties, and require construing the same License Agreement, looking to the same evidence, and questioning the same witnesses. Therefore, this Court has supplemental jurisdiction over VariBlend's breach of contract and tortious interference causes of action.

### B. JURISDICTION OVER BRUGGER'S DECLARATORY JUDGMENT ACTION

In response to VariBlend's complaint, Brugger brought a counterclaim under the Federal Declaratory Judgment Act seeking clarification that he did not invent the Holzmann Patents under 35 U.S.C. § 256 and 28 U.S.C. § 1454. Section 256 of Title 35 of the United States Code establishes a cause of action for correction of inventorship. Section 1454 of Title 28 of the United States Code allows federal courts to exercise "jurisdiction over claims arising under the patent laws *even* when asserted in counterclaims, rather than in an original complaint." *Vermont v. MPHJ Tech. Invs., LLC*, 803 F.3d 635, 644 (Fed. Cir. 2015). Counterclaim-Defendants argue that Brugger has no standing to bring such a claim. Brugger asserts that "[t]he nature of the inventorship dispute, as pled through [his] declaratory judgment Counterclaim, establishes

jurisdiction under Section 1454." Doc. 29 at 14. The Court agrees with Counterclaim-Defendants.

## 1. LEGAL STANDARD

Courts have held that an action brought under § 256 is one "arising under" federal patent law for jurisdictional purposes. *MCV, Inc. v. King-Seeley Thermos Co.*, 870 F.2d 1568, 1570 (Fed. Cir. 1989). Section 256(a) provides that:

> Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.

The statute is addressed to "interested parties," and is meant "to have the inventorship of a patent changed to reflect the true inventors of the subject matter claimed in the patent." *Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1324 (Fed. Cir. 2009) (quoting *Fina Oil*, 123 F.3d at 1471). The Federal Circuit interprets this statute broadly, "as a 'savings provision' to prevent patent rights from being extinguished simply because the inventors are not correctly listed." *Chou v. Univ. of Chi.*, 254 F.3d 1347, 1358 (Fed. Cir. 2001) (quoting *Pannu*, 155 F.3d at 1349). "The interest of both inventors and the public are . . . served by a broad interpretation of the statute." *Id.*

"[A] plaintiff seeking correction of inventorship under § 256 can pursue that claim in federal court only if the requirements for constitutional standing—namely injury, causation, and redressability—are satisfied." *Larson*, 569 F.3d at 1326. To satisfy these three elements,

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third,

it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations omitted).  For purposes of § 256, there are at least three recognized interests that give rise to Article III standing:  (1) ownership interest, *see Chou*, 254 F.3d at 1358; (2) financial interest, *id.* at 1359; and (3) reputational interest, *Shukh v. Seagate Tech., LLC*, 803 F.3d 659, 662–63 (Fed. Cir. 2015).

## 2.  DISCUSSION

Brugger maintains that he has suffered financial and reputational harm as a result of VariBlend's claims that he should have been a named inventor on the Holzmann Patents. Counterclaim ¶ 137.  He also alleges that he has an ownership interest in the Holzmann Patents. Doc. 29 at 18–19.  As discussed in detail below, the Court does not find that these interests meet Article III's standing requirements.

### a.  Financial Interest

Brugger claims a financial interest in not being named one of the inventors of the patent because, if he is named an inventor, he will be liable to VariBlend for breach of the License Agreement.  Doc. 29 at 19–21.  According to Brugger, it cannot be that VariBlend wishes to hold him liable for breach of the License Agreement because he allegedly conspired with Holzmann to attain the patents while simultaneously refusing to recognize his economic interests in the declaratory judgment action.  The Court is not convinced.

Brugger cites extensively to *Intellisoft, Ltd. v. Acer America Corp.* in support of his position.  2018 WL 2412179.  In that case, the Northern District of California similarly considered a counterclaim "seeking a declaratory judgment that Bierman did not contribute to the invention of the ideas in the '713 patents and was properly not named as an inventor of those

patents." *Id.* at *1.  The Court there found that Bierman had shown sufficient injury to satisfy

Article III's standing requirement because "the facts alleged, under all the circumstances show

that there is a substantial controversy, between parties having adverse legal interests, of

sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at *6–7

(internal quotations omitted) (quoting *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329,

1336 (Fed. Cir. 2008)).  The court also found that the legal fees incurred by the plaintiff and the

potential liability hinging on the question of inventorship were enough to grant Article III

standing. *Id.* at *7 n.4.

Although *Intellisoft* appears on point, there is one key difference that distinguishes it.  In

a previous order, the *Intellisoft* court had already found that the question of inventorship was

necessary to granting plaintiff's relief.  *See Intellisoft, Ltd. v. Acer Am. Corp.*, No. 17 Civ. 06272

(PJH), 2018 WL 496739, at *13 (N.D. Cal. Jan. 22, 2018) ("Plaintiff's state court cause of action

is premised on a showing that the '713 Family of Patents contain ideas that were not conceived

of by the named inventors of those patents.  Plaintiff does not dispute that Bierman's purported

conception of the technology is central to plaintiff's misappropriation theory.").[7]  Therefore, it

could more neatly superimpose the question of inventorship onto the question of injury for

purposes of Article III standing.  In other words, the *Intellisoft* plaintiff would necessarily incur

economic and other injuries depending *only* on how the question of inventorship was resolved.

Such is not the case here.  VariBlend brings only one cause of action against Brugger:  breach of

contract.  Its remaining causes of action are only against Crystal.  As described in detail above,

the question of inventorship is not necessary raised by the breach of contract claim because the

---

[7] The *Intellisoft* court later reaffirmed this order.  2018 WL 2412179, at *6 ("Counter-defendants next argue that
Acer does not have Article III standing because Acer has not alleged an injury.  This argument ignores the court's
prior order and the relevant law.").

claim can be resolved on at least one theory that does not require showing inventorship. *See supra* Section II.A.2.a.i. This means that, regardless of how the question of inventorship is resolved for purposed of Declaratory Judgment, Brugger could still be liable for the monetary damages asserted in the complaint. Therefore, it is speculative at best that this economic injury will in any way be "redressed by a favorable decision" on the declaratory judgment counterclaim. *Lujan*, 504 U.S. at 560–61.

### b. Reputational Interest

Brugger also asserts that questions around the inventorship of the patent have "place[d] a cloud over [his] business activities and reputation." Counterclaim ¶ 137.

The Federal Circuit has recognized that a "concrete and particularized reputational injury can give rise to Article III standing." *Shukh*, 803 F.3d at 663. In *Shukh*, the Court found that the pecuniary interests associated with being a named inventor in a patent—including potential employment consequences—could be "sufficient to demonstrate Article III standing." *Id.* There, Shukh alleged that Seagate had failed to properly list him as an inventor of several patents. He further alleged that he suffered reputational injury as a result in at least two ways: "first, it harmed his reputation as an inventor in the field of semiconductor physics, and second, it contributed to his reputation for poor teamwork due in part to his accusations that others were stealing his work." *Id.* In addition, "Dr. Shukh presented evidence from which a trier of fact could conclude that these reputational harms had economic consequences—namely, that Dr. Shukh was unable to find employment after he was terminated from Seagate." *Id.*

In this case, Brugger has made no such allegations. Instead, he has only ominously suggested that the ongoing litigation has "place[d] a cloud over [his] business activities and reputation." Counterclaim ¶ 137. This injury, as pled, is neither concrete nor particularized. *See*

*Shukh*, 803 F.3d at 663.  He has made no effort to show what those specific reputational harms might be, or how those might affect his economic position, either now or in the future.  For example, he has not alleged that he has been unable to find work as a result of the pending lawsuit, or that his status as an inventor has been degraded in any way.

As is, his case is an unusual one.  Typically, § 256 claims are brought by parties who *wish* to be listed as either sole or co-inventors.[8]  Here, however, Brugger has asserted reputational harms stemming from the suggestion that he may have contributed to a patent, without any indication of how these harms may be redressed by a finding in his favor.  If the Court issues a declaratory judgment that the inventors listed on the Holzmann patents are correct (which, notably, is already the presumption afforded to issued patents, *see* 35 U.S.C. § 282), that does not necessarily end the litigation or put an end to VariBlend's assertion that Brugger violated the License Agreement by developing additional technologies, regardless of whether or not he meets the legal definition of "inventor."  Even were the Court to find that Brugger's reputational interests would theoretically be vindicated by a ruling in his favor, at least one court has refrained from finding that *Shukh* captures this kind of reputational harm.  *See Pedersen v. Geschwind*, 141 F. Supp. 3d 405, 418 (D. Md. 2015) (finding that "redefining a patent not as a badge of professional and intellectual honor but as an albatross around the neck," would "turn th[e] law on its head," and declining to find an injury redressable by § 256 "[w]ithout any indication that the Federal Circuit intended *Shukh* to sweep so broadly").  Similarly, this Court

---

[8] Defendants are correct that "an expectation of ownership of a patent is not a prerequisite for a putative inventor to possess standing to sue to correct inventorship under § 256." *Chou*, 254 F.3d at 1358.  However, the court in *Chou* was considering the rights of putative inventors who must contractually assign their rights.  The court found that these inventors, though they did not own the patent, would still reap certain benefits from being named on the patent.  In the case of Chou, she alleged a clear financial benefit owed to her for being an inventor, even if she did not own the patent.  *Id.* at 1359.  Therefore, Chou was still experiencing a recognized harm as a result of not being named an inventor.

agrees that, on the scarce information provided in Brugger's Counterclaim, it cannot find that this is the kind of reputational harm that can be redressed by § 256.

### c. Ownership Interest

Finally, Brugger asserts that he has an ownership interest in the Holzmann Patents sufficient to confer standing over his declaratory judgment counterclaim. This assertion arrives not in the Counterclaim itself, but rather in Brugger's motion papers. Doc. 29 at 18–19. Brugger bases this ownership interest on VariBlend's assertion that Brugger is an inventor. The Court finds this argument circuitous, as it requires looking to VariBlend's allegations, rather than to Brugger's Counterclaim, to establish standing. Moreover, these are the very assertions that Brugger fundamentally contests. Counterclaim ¶¶ 132–36. The Court rejects this argument and finds that Brugger has asserted no plausible ownership interest sufficient to assert standing for his declaratory judgment counterclaim.

***

Therefore, the Court finds that Brugger lacks Article III standing to bring his counterclaim under 35 U.S.C. § 256 and this Court lacks jurisdiction over the claim.

## III. MOTION TO DISMISS BRUGGER'S COUNTERCLAIMS

The Court will next consider Counterclaim-Defendants' (VariBlend, J. Burke, and JBCP-24) motion to dismiss Brugger's counterclaims under Federal Rule of Civil Procedure 12(b)(6).

### A. LEGAL STANDARD

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he

purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal citations and quotation marks omitted).

Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . . ."). However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## B.  DISCUSSION

Counterclaim-Defendants seek partial dismissal of the breach of contract claim as to VariBlend, and dismissal of the entire breach of contract claim, the fraud claim, and the tortious interference claim as to the JBCP parties.  The Court considers each of these arguments in turn.

### 1. Breach of Contract Claim

"Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank N.A.*, 632 F.3d 793, 799 (2d Cir. 2011). The Counterclaim sets out three theories for establishing breach of contract: (1) VariBlend's failure to pay minimum royalties and make minimum sales; (2) VariBlend's failure to use commercially reasonable and best efforts; and (3) VariBlend's failure to return protected information. Counterclaim-Defendants argue that the entire breach of contract claim should be dismissed as to the JBCP parties. Additionally, they argue that part of this claim should also be dismissed as to VariBlend for failure to allege damages. The Court grants the motion as to the JBCP parties and denies the motion as to VariBlend.

### a. Counterclaim-Defendants J. Burke and JBCP-24

The JBCP parties argue that all three counts in the breach of contract claim should be dismissed as to them. Doc. 27 at 8–9, 21–25. First, they argue that any contract claims against J. Burke are improper because it is not a party to the contract. Next, they argue that the counterclaim only alleges damages resulting from VariBlend's breach, not from any breach by the JBCP parties. Finally, they argue that the JBCP parties are not VariBlend's alter-egos and therefore cannot be held liable for VariBlend's alleged breaches. The Court first considers whether the JBCP parties are alter egos of VariBlend, as this will affect the rest of the analysis.

### i. Alter Ego Liability

"New York courts apply a presumption of separateness to corporations and are hesitant to disregard the corporate form." *Prescient Acquisition Grp., Inc. v. MJ Pub. Trust*, 2006 WL 2136293, at *4 (S.D.N.Y. July 31, 2006) (citing *DeJesus v. Sears, Roebuck & Co.*, 87 F.3d 65,

70 (2d Cir. 1996)).[9]  To prove that the corporate veil should be pierced under New York law, a plaintiff must show "(1) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (2) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Thrift Drug, Inc. v. Universal Prescription Adm'rs*, 131 F.3d 95, 97 (2d Cir. 1997) (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F3d 130, 134 (2d Cir. 1997)).  "Veil-piercing is a fact specific inquiry and courts consider many factors.  However, conclusory allegations of an alter ego are insufficient to survive a motion to dismiss." *Kalin v. Xanboo, Inc*, 526 F. Supp. 2d 392, 403 (S.D.N.Y. 2007) (internal citations omitted).

Counterclaim-Defendants argue that Brugger has failed to satisfy either prong of the alter ego liability test with regard to the JBCP parties.  Doc. 27 at 21–25.  Brugger contends that he has pled sufficient facts to meet the plausibility standard on a motion to dismiss, and that alter ego liability is a fact-specific inquiry best reserved for triers of fact.  The Court finds that Brugger has not pled sufficient facts to properly allege alter ego liability.

### A. *First Prong:  Complete Domination*

For Brugger to establish that the JBCP parties should have alter ego liability for VariBlend's breaches, "the domination shown must be complete domination of the corporation concerning the transaction in issue.  The extent of the domination and control must preclude the controlled entity from having legal or independent significance of its own." *In re Sunbeam*

---

[9] The parties initially disagree about whether to use New York or Delaware law, although both admit that the test for alter ego liability is substantially the same in each jurisdiction.  New York choice of law principles generally dictate that the law of the place of incorporation is to be applied to questions of alter ego liability. *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995).  However, the License Agreement compels a different result.  Under Section 17, the License Agreement states that "all matters directly or indirectly related [to the Agreement] shall be governed by the internal law of the State of New York, without regard to its conflict or choice of law provisions."  Because there is no dispute that Brugger's counterclaims are "directly or indirectly related" to the Agreement, the Court will apply New York law.

*Corp.*, 284 B.R. 355, 366 (Bankr. S.D.N.Y. 2002) (internal citations and quotations omitted).

There is no explicit test for determining whether the parent or shareholder exercises complete

domination over a corporation.  Instead, the Court looks at a variety of factors such as:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own

*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir.

1991).

Here, Brugger has pled facts that address at least some of these factors.  For example, he

has pled that VariBlend was inadequately capitalized at the time of breach.  Counterclaim

¶ 16(b).  He has also pled that there was at one time an overlap in directors between VariBlend

and the JBCP parties (though not at the time of breach).  *Id.* ¶ 14, 16(c).  And he has pled that

VariBlend and the JBCP parties share physical addresses (and perhaps e-mail addresses).  *Id.*

¶¶ 13, 16(d).  Finally, he has sufficiently established that JBCP-24—but not J. Burke—

guaranteed VariBlend's debts under the License Agreement.  *Id.* ¶ 16(e).

Other allegations are conclusory at best.  For example, Brugger avers without any factual

support that "VariBlend is influenced and governed by Counterclaim Defendants [J. Burke] and

JBCP-24, and [that] [J. Burke] and JBCP-24 exercise control over VariBlend."  *Id.* ¶ 16(a).  He

also alleges without any factual support that the JBCP parties "are attempting to escape liability

for their unlawful activity, as set forth herein, by hiding behind VariBlend and manipulating its

assets and liabilities to avoid responsibility for unlawful acts . . . that they directed and caused for their own benefit." *Id.* ¶ 17.  Moreover, Brugger has failed to even cursorily define the relationship between VariBlend and the JBCP parties.

However, because Brugger has sufficiently pled facts as to at least some of the *Passalacqua* factors, the Court finds that Brugger has—just barely—met the pleading requirement for complete domination for purposes of a 12(b)(6) Motion to Dismiss.  *See SungChang Interfashion Co. v. Stone Mountain Accessories, Inc.*, No. 12 Civ. 7280 (ALC) (DCF), 2013 WL 5366373, at *12 (S.D.N.Y. Sept. 25, 2013) (finding that plaintiff had "alleged some factors that justify disregarding the corporate form" and that "piercing the corporate veil involves a fact laden inquiry, which is unsuited for resolution on a pre-answer, pre-discovery motion to dismiss").

### B. Second Prong:  Domination Used to Commit Fraud or Wrongdoing

Although Brugger has pled sufficient facts to plausibly establish the first prong of the alter ego liability test, he fails to do the same for the second prong, which requires showing that this domination was used to commit fraud or wrong.  This prong "can be satisfied by showing a 'breach of a legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights.'" *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 324 (S.D.N.Y. 2009) (quoting *Elec. Switching Indus. V. Faradyne Elec. Corp.*, 833 F.2d 418, 424 (2d Cir. 1987)). "Where the challenged complaint lacks this causative element—i.e., the use of domination to cause the injury, it should result in the dismissal of the corporate veil-piercing allegation." *SungChang Interfashion Co.*, 2013 WL 5366373, at *6 (quoting *CSX Transp., Inc. v. Filco Carting Corp.*, 2011 WL 2713487, at *3 (E.D.N.Y. July 11, 2011)).

Brugger alleges that this prong is met because J. Burke undercapitalized VariBlend, which caused VariBlend to default on royalty payments to him in breach of the License Agreement. Counterclaim ¶¶ 16–17, 46–49. As evidence of this, Brugger points to an e-mail from J. Burke's CEO stating that he would not fund VariBlend's enterprise with Brugger. *Id.* ¶ 47. The direct result was that VariBlend was unable to pay Brugger's royalties because it was undercapitalized and therefore breached the License Agreement. *Id.* ¶¶ 48–49.

The Court does not find that this plausibly suggests any fraud or wrongdoing. Nowhere does Brugger allege that J. Burke had a legal duty to fund VariBlend's enterprise with him. Neither does he allege sufficient facts to imply that J. Burke acted dishonestly or unjustly in refusing to fund the venture. By Brugger's own admission, VariBlend had other investors it could have gone to for help (e.g., Emil Capital Partners), and there is nothing to suggest that the JBCP parties would have interfered with this kind of assistance. *Id.* ¶ 44. Most importantly, the Counterclaim fails to establish a connection between a misuse of the corporate form and the alleged wrongdoing. In other words, Brugger does not suggest in any way that the JBCP parties used their domination over VariBlend to procure the breach. Much less does Brugger establish what the JBCP parties stood to gain from such actions, especially if, as the Counterclaim alleges, at least one JBCP entity, JBCP-24, guaranteed VariBlend's debts. *Id.* ¶ 16.e.

Therefore, the Court finds that Brugger has not pled sufficient facts to establish the second prong of the alter ego liability test. As currently pled, the Counterclaim does not plausibly suggest that the JBCP parties were alter egos of VariBlend so as to be liable for its breaches.

### ii. J. Burke as a Party to the Contract

Counterclaim-Defendants argue that all contract claims against J. Burke are improper because it is not a party to the License Agreement. Doc. 27 at 9. Brugger argues that even if J. Burke cannot be considered VariBlend's alter ego, it is still an appropriate party to the contract claims because it was in privity with Brugger. Doc. 31 at 13–15. The Court agrees with Counterclaim-Defendants.

"[G]enerally, a party who is not a signatory to a contract cannot be held liable for breaches of that contract." *MBIA Ins. Corp. v. Royal Bank of Canada*, 706 F. Supp. 2d 380, 396 (S.D.N.Y. 2009) (collecting cases). However, a non-signatory may be held liable for breach of contract where the non-signatory (1) is the alter ego of the signatory, *id.* at 396–97; (2) manifests an intent to be bound by the contract, *id.* at 397; or (3) actions show they are in privity of contract or assumed obligations under the contract, *id.*

Courts have interpreted privity of contract as "the relationship between the parties to a contract, allowing them to sue each other but preventing a third party from doing so." *Impulse Mktg. Grp. v. Nat'l Small Bus. Alliance, Inc.*, No. 05 Civ. 776 (KMK), 2007 WL 1701813, at *6 (S.D.N.Y. June 12, 2007) (citing *Privity of Contract*, Black's Law Dictionary (8th ed. 2004)). In assessing whether privity exists, courts look in part to whether the parties "shared similar interests," *id.*, or "whether the parties intended to be bound," *MBIA*, 706 F. Supp. 2d at 398. Courts have found that privity exists where the non-signatory is in a joint venture with the parties, assisted in drafting the contract, and attended meetings regarding the contract. *See ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 35, 73–74 (S.D.N.Y. 1999). Courts have also found that privity exists where the non-signatory allegedly "micro-managed performance under the

Contract, acknowledged that it was the actual party in interest, and paid for Plaintiff's services." *Impulse Mktg.*, 2007 WL 1701813, at *6.

As evidence of privity between himself and J. Burke, Brugger points to an email from J. Burke's CEO, Jim Burke. Doc. 31 at 13–15. In the e-mail, Burke states: "I have been in contact with Jamie [Burke, son of CEO Jim Burke] regarding your meeting in Munich, your feedback and your most recent proposal. . . . Put simply, I will not fund the business under that proposal." Counterclaim ¶ 47 (alteration in original and emphasis removed). Without more, this statement is insufficient to allege that Brugger and J. Burke were in privity for purposes of the contract. Unlike in *Impulse Marketing Group*, there is no showing that J. Burke "micromanaged" the contract or that it acknowledged that it was an actual party in interest. And, although the statement suggests that a J. Burke representative may have attended a meeting with Brugger regarding the contract, Brugger does not allege that J. Burke was in any way involved in initially negotiating or undertaking performance of the contract. In short, there is nothing in the Counterclaim to suggest that J. Burke intended to be bound by the License Agreement.

Therefore, the Court grants Counterclaim-Defendants' motion to dismiss Count I with respect to J. Burke.

### iii. Showing of Damages

Finally, Counterclaim-Defendants argue that the contract claim against all JBCP parties, including JBCP-24, should be dismissed because the Counterclaim does not allege that these parties caused any of the damages Brugger seeks. The Court agrees.

Throughout its breach of contract claim, Brugger refers repeatedly to breaches caused by VariBlend. Counterclaim ¶¶ 56–91. Aside from the alleged false invoice scheme, for which Brugger concedes it is not seeking damages, the role played by the JBCP parties—and especially

by JBCP-24—in any of the alleged breaches is unclear at best. Therefore, as currently written, the Counterclaim fails to state a cause of action for breach of contract as to any of the JBCP parties because it fails to properly allege damages caused by these parties. For this independent reason, the Court grants Counterclaim-Defendants' Motion to Dismiss Count I with respect to the JBCP parties. *See, e.g.*, *Doyle v. MasterCard Int'l Inc.*, No. 15 Civ. 9360 (LTS), 2016 WL 9649874, at *2 (S.D.N.Y. Dec. 15, 2016), *aff'd*, 700 F. App'x 22 (2d Cir. 2017) (noting that plaintiff must allege "breach of contract by the defendant" to state a claim against that defendant).

### b. Counterclaim-Defendant VariBlend

Additionally, Counterclaim-Defendants argue that Count I.A of the Counterclaim should be dismissed as to VariBlend. Doc. 27 at 9–11. Count I.A alleges that VariBlend breached Sections 5.1 and 5.3 of the License Agreement, which required VariBlend to pay Brugger minimum royalties corresponding to a required minimum volume of sales, respectively. Counterclaim ¶¶ 60–62. It states that VariBlend was in breach from at least April 2017 to March 2018 and asserts damages for past due royalties from this period, as well as future minimum royalties for March 2018 through the end of the Agreement. *Id.* ¶¶ 63, 70–71. Brugger also alleges that VariBlend and the JBCP parties were engaged in a conspiracy from 2014 to 2017 to falsify sales invoices and that it was also in breach during this time period. *Id.* ¶¶ 64–67.

Counterclaim-Defendants read the allegations regarding the falsified invoice scheme as suggesting a different theory of breach. Doc. 27 at 9–11. They argue that this part of the claim cannot be sustained as to any of the parties, including VariBlend, because Brugger fails to allege damages resulting from this supposed breach. By Brugger's own admission, they argue, even if the invoices were false, he was paid the required royalties for these. Counterclaim ¶ 65. In

response, Brugger argues that Counterclaim-Defendants have misread his allegations and that "the plain language of Brugger's counterclaim, as averred, does not assert breach of contract based on VariBlend falsified sales and falsified invoices." Doc. 31 at 16. Instead, Brugger maintains that he was just attempting to "provide[] background on how the JBCP Entities were involved," specifically "how the JBCP Entities conspired with VariBlend to cover up years of low sales with falsified invoices, ultimately culminating in VariBlend's breach of Section 5.1 and 5.3 of the Agreement from April 2017 to the end of the Agreement." *Id.* at 15–16.

To the extent that Brugger's breach of contract theory is based on the false invoice scheme, the Court finds that Brugger has failed to adequately plead damages as required to maintain a contract action. *See, e.g.*, *Pu v. Russell Publ'g Grp., Ltd.*, 683 F. App'x 96, 97 (2d Cir. 2017) (finding that plaintiff "was required to allege facts showing that the complained-of activity caused him damages in order to state a claim for breach of contract"). However, it appears that both sides now agree that the damages for Count I.A do not arise from actions taken from 2014 to April 2017 in relation to the alleged false invoice scheme. Counterclaim-Defendants offer no other reason for dismissing this part of the claim as to VariBlend. Therefore, the Court denies the motion as to VariBlend.

## 2. Fraud Claim

To prevail on a claim for fraud under New York law a plaintiff must show that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996). When pleading a claim for fraud in federal court, claimants must adhere to Rule 9(b) of the Federal Rules of Civil Procedure, which requires claimants to

"state *with particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). The Second Circuit has explained that Rule 9(b)'s special pleading requirement "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Consequently, allegations that "fail to specify the time, place, speaker, and . . . content" of the alleged fraud "lack the particulars required by Rule 9(b)." *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986) (citation and internal quotation marks omitted); *accord Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999) (explaining same). Nonetheless, the "adequacy of particularized allegations under Rule 9(b) is case- and context-specific." *United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017) (alterations and internal quotation marks omitted).

Counterclaim-Defendants argue that Brugger's fraud claim should be dismissed because: (1) it does not adequately allege reliance on the fraud; (2) it does not allege permissible fraud damages; and (3) it is duplicative of the breach of contract claim. Doc. 27 at 12–15.

Reading the facts in the light most favorable to Brugger, it is plausible that Brugger has adequately alleged reliance and that the fraud and contract claims should be considered separately. However, for the reasons listed below, the Court cannot find that Brugger has properly alleged damages.

New York follows the "out-of-pocket" rule for fraud damages, where the injury incurred by the fraud must be "actual pecuniary loss sustained as the direct result of the wrong." *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373 (N.Y. 1996) (internal quotation and citation omitted). "Those losses must be the direct, immediate, and proximate result of the

misrepresentation" and "must also be independent of other causes." *Kregos v. Associated Press*, 3 F.3d 656, 665 (2d Cir. 1993). "If the fraud causes no loss, then the plaintiff has suffered no damages." *Connaughton v. Chipotle Mexican Grill, Inc.*, 75 N.E.3d 1159, 1163 (N.Y. 2017) (internal quotation and citation omitted).

Brugger claims damages of "lost royalty payments and lost business opportunities" due to the fact that he was "unable to terminate the License Agreement and seek to license the Patents to others" as a result of the falsified invoice scheme. Counterclaim ¶ 101. However, the Counterclaim fails to make any showing that Brugger actually incurred a pecuniary loss as a result of the falsified invoice scheme. For example, Brugger fails to point to even a single lost business opportunity so as to demonstrate the difference between what he was actually paid under the falsified invoice scheme and what he could potentially have been paid. The cases Brugger cites in support make such a showing. For example, in *Doehla v. Wathne Ltd.*, the court found that damages had been adequately pled where plaintiff's complaint pointed to a specific business opportunity that it had foregone and sufficiently alleged that it had foregone this business opportunity *because of* the fraudulent representations made. No. 98 Civ. 6087 (CSH), 2000 WL 987280, at *8–9 (S.D.N.Y. July 17, 2000). Without more, the Court cannot infer that Brugger suffered any kind of loss as a result of the falsified invoice scheme.

Therefore, the Court grants Counterclaim-Defendants' motion to dismiss the claim for fraud on this basis.

### 3. Tortious Interference Claim

To plead a claim for tortious interference with a contract, Brugger must allege "the existence of [a] valid contract with a third party, [counterclaim-]defendant's knowledge of that contract, [counterclaim-]defendant's intentional and improper procuring of a breach, and

damages." *See White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 835 N.E.2d 381, 383 (N.Y. 2007). Counterclaim-Defendants make two arguments for dismissing this claim. First, they argue that the claim should be dismissed as to JBCP-24 because JBCP-24 was a party to the License Agreement and, as such, cannot be said to have tortuously interfered with the contract. Doc. 27 at 16–17. Second, they argue that the claim should be dismissed as to both JBCP parties because it does not sufficiently allege that they acted without justification in declining to fund VariBlend's venture with Brugger. They raise the economic interest defense and argue that these parties decided to stop funding the venture to protect their own economic interests. *Id.* at 17–20. The Court grants Counterclaim-Defendants' motion to dismiss the claim for tortious interference.

### a. Third-Party Requirement

In order to meet the third-party requirement for tortious interference, courts have held that "a plaintiff bringing a tortious interference claim must show that the defendants were *not parties to the contract*." *Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir. 1996) (citing *Israel v. Wood Dolson Co.*, 134 N.E.2d 97, 99 (N.Y. 1956)). Brugger argues that, even though JBCP-24 was a party to the contract, it can still be held liable for tortious interference because "JBCP-24's obligations under the Agreement are not those Brugger alleges were subject to JBCP's interference. Rather, the interfered-with obligation was VariBlend's obligation to make royalty payments to Brugger." Doc. 31 at 23. Brugger points to *Leber Associates, LLC v. Entertainment Group Fund, Inc.* as support for the holding that a party to a multilateral agreement can sometimes "tortiously interfere with contractual relations between parties other than itself under that agreement." No. 00 Civ. 3759 (LTS) (MHD), 2003 WL 21750211, at *18 (S.D.N.Y. July 29, 2003) (emphasis removed).

In cases like *Leber*, however, the other contracting party was found to have "rights and duties that are separate from those of the breaching party." *Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*, 552 F. App'x 13, 18 (2d Cir. 2014) (quoting *UBS Sec. LLC v. Highland Capital Mgmt., L.P.*, 927 N.Y.S.2d 59, 66 (App. Div. 2011)).  Brugger fails to allege how JBCP-24's rights and duties are separate and apart from VariBlend's.  He alleges that the "interfered-with obligation was VariBlend's obligation to make royalty payments to Brugger," but these are the very obligations that JBCP-24 had a contractual obligation to guarantee under the License Agreement.  Doc. 31 at 23; License Agreement § 5.2.  Therefore, Brugger has not pled sufficient facts to establish that JBCP-24 is a proper party to the claim for tortious interference.

### b. Economic Interest Defense

"[W]here a third party has an 'economic interest' in an entity and interferes with an existing contractual relationship between the plaintiff and that entity, such interference is considered privileged and the plaintiff must show malice or illegality in order to establish a tortious interference claim."  *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 460 F.3d 281, 283 (2d Cir. 2006); *see also Foster v. Churchill*, 665 N.E.2d 153, 156 (N.Y. 1996) ("[P]rocuring the breach of a contract in the exercise of equal or superior right is acting with just cause or excuse and is justification for what would otherwise be an actionable wrong.") (internal citations omitted).  For the economic interest defense to apply, the defendant must "have an economic interest in the contract."  *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 406 (S.D.N.Y. 2009).  New York courts have found that the economic interest defense can be asserted where, for example, "defendants were significant stockholders in the breaching party's business; where defendant and the breaching party had a parent-subsidiary relationship; where defendant was the breaching party's creditor; and where the defendant had a managerial contract

with the breaching party at the time defendant induced the breach of contract with plaintiff." *Id.* (internal citation omitted). If the economic interest defense applies, then "[t]he plaintiff must also adequately allege that the defendant either acted maliciously, fraudulently, or illegally." *Id.* On a 12(b)(6) Motion to Dismiss, the facts underlying the defense must be evident on the face of the complaint. *See, e.g.*, *Reach Music Pub., Inc. v. Warner/Chappell Music, Inc.*, No. 09 Civ. 5580 (LTS) (GWG), 2011 WL 3962515, at *6 (S.D.N.Y. Sept. 7, 2011), *amended on denial of reconsideration*, No. 09 Civ. 5580 (LTS), 2012 WL 695461 (S.D.N.Y. Mar. 5, 2012) ("It is improper for the Court to make a determination at this juncture as to the economic interest defense. A motion pursuant to Rule 12(b)(6) addresses the sufficiency of the pleadings; the facts upon which the Reach Parties premise this defense are not developed in the pleadings. Matters extraneous to the pleadings are generally inappropriate for consideration on a motion to dismiss a claim.").

Brugger states in his Counterclaim that "a representative of [J. Burke] made statements to Brugger regarding [J. Burke]'s refusal to continue to fund VariBlend in view of Brugger's unwillingness to renegotiate the License Agreement on terms dictated by executives of [J. Burke] and JBCP-24." Counterclaim ¶ 114. On the face of the Counterclaim, J. Burke was one of VariBlend's funders and by extension had an economic interest in its License Agreement with Brugger. Also present on the face of the Counterclaim is the fact that J. Burke stopped funding VariBlend because Brugger would not "renegotiate the License Agreement on terms dictated by executives of [J. Burke] and JBCP-24." *Id.* Even read in the light most favorable to Brugger, these statements establish that [J. Burke]'s actions were economically motivated and therefore not improper or without justification. Although Brugger restates repeatedly that [J. Burke] acted

"intentionally and maliciously" in causing VariBlend to breach the license agreement, these allegations are conclusory and unsupported by any factual statements in the Counterclaim.

Brugger attempts to save the claim by arguing that the "extreme and unfair economic pressure" asserted by J. Burke should meet the "without justification" intent requirement for tortious interference with a contract.  Doc. 31 at 24–25.  Brugger argues that this should be sufficient because this kind of pressure is recognized as meeting the "wrongful means" requirement for tortious interference with business relations, which is more stringent than the "without justification" requirement for tortious interference with a contract.  To show that J. Burke used "extreme and unfair economic pressure," Brugger points to Jim Burke's e-mail stating that he would not continue to fund VariBlend if he did not accept new contract terms.  Counterclaim ¶¶ 46–50, 114–16.

Even assuming that Brugger's theory on the transferability of the "wrongful means" requirement holds water, Brugger has failed to properly allege that J. Burke acted with wrongful means.  There is nothing to suggest that J. Burke exerted undue economic pressure on VariBlend to breach its contract with Brugger.  For example, the Counterclaim contains no allegations that J. Burke made its funding of VariBlend contingent on breaching the agreement with Brugger.  And the Counterclaim certainly does not allege "extreme" pressure "approaching a separate crime or tort," as is necessary for a wrongful means analysis.  *Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427, 435 (S.D.N.Y. 2007) ("In any event, although Chubb certainly exerted some pressure upon Angeliades to drop Vinas, I cannot say that that pressure alleged by Vinas was 'extreme' in a manner approaching a separate crime or tort.").  Finally, "for economic pressure to constitute economic means, such pressure must have been for the 'sole purpose of inflicting intentional harm on plaintiffs.'"  *Catskill Development, LLC v. Park Place Entertainment Corp.*,

547 F.3d 115, 137 (2d Cir. 2008) (quoting *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1104

(N.Y. 2004)). The Counterclaim cannot be read to support that this was the case here.

Therefore, the Court dismisses the tortious interference claim as to the JBCP parties.

## IV.    CONCLUSION

For the foregoing reasons, the Court DENIES VariBlend's Motion to Remand the action

and DISMISSES Brugger's Declaratory Judgment Action for lack of jurisdiction. The Court

GRANTS Counterclaim-Defendants' Motion to Dismiss the claims for breach of contract, fraud,

and tortious interference as to the JBCP parties. The Court DENIES Counterclaim-Defendants'

Motion to partially dismiss the breach of contract claim as to VariBlend. All dismissals are

without prejudice.

The parties are directed to appear for an initial conference on October 24, 2019 at 10:30

AM. The Clerk of Court is respectfully directed to terminate the motions, Docs. 19, 25.

SO ORDERED.

Dated:     September 30, 2019
           New York, New York

Edgardo Ramos, U.S.D.J.

49